No. 13336

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

GARY LYNN BUCKLEY,

Defendant and Appellant.

Appeal from: District Court of the Eleventh Judicial District,
Honorable Robert S. Keller, Judge presiding.

Counsel of Record:

For Appellant:

Fennessey, Crocker & Harman, Libby, Montana
David W. Harman argued, Libby, Montana
Jean Ellison appeared, Libby, Montana
Donald L. Shaffer, Libby, Montana

For Respondent:

Robert L. Woodahl, Attorney General, Helena,
Montana
Lon J. Maxwell argued, Assistant Attorney General,
Helena, Montana
William A. Douglas argued, County Attorney, Libby,
Montana

Submitted:  October 12, 1976

Decided: DEC 15 1976

Filed: DEC 15 1976

Clerk

Mr. Chief Justice James T. Harrison delivered the Opinion of the Court.

This is an appeal from a jury verdict of guilty, and sentence of 100 years in the state prison of the district court, Lincoln County.

The essential facts began in late June 1975 and culminated with the homicide of James A. McIntyre on July 4, 1975. McIntyre, a newcomer to Eureka, Montana, was working on a ranch in the vicinity and staying at the DeLong cabin near Glen Lake, with the consent of the owner. On July 3, 1975, Gary Buckley also received permission from DeLong to stay at his cabin, as he had done on another occasion. At this time Buckley was AWOL from the United States Marine Corps. McIntyre was never informed that Buckley had obtained permission to stay at the DeLong cabin and upon re- turning to the cabin on July 3, 1975, he was surprised to be met by him. They introduced themselves and McIntyre left shortly thereafter. Believing Buckley to be on the premises unlawfully, McIntyre and one Jay Allison went to the local police to inform them. That night McIntyre returned to the cabin with a Lincoln County sheriff's deputy in McIntyre's truck. The deputy was dressed in civilian clothes and was armed at the time. After failing to find Buckley, the deputy and McIntyre left and rendezvoused with Allison and two other law enforcement officers. The officers returned to Eureka, but McIntyre and Allison returned to the cabin, searched the area again, and according to Buckley, yelled threats directed at him, if he should be nearby, to stay away or he would be harmed.

Buckley stated he observed all of these events from nearby where he was sleeping for the night because he feared for his life and believed Allison and McIntyre were out to get him, McIntyre being Allison's hired gun, as a result of a falling out between Allison and Buckley.

The rest of the episode comes from Buckley through his statement given after his arrest and testimony at trial:

On the afternoon of July 4, 1975, Buckley was reading a book in the DeLong cabin when he saw McIntyre's truck approach. The truck went slowly past the cabin, did not come into the driveway, and stopped 15 to 20 yards past the cabin. Buckley, sensing danger, rose from his chair, got his .44 magnum, and went to the door. As he went past the refrigerator, Buckley heard a noise behind him, outside the cabin. As he turned, he saw McIntyre holding a rifle waist high. McIntyre leveled the rifle and shot at Buckley, missing him. Buckley fired back, and missed McIntyre. McIntyre began running to his truck, and Buckley continued shooting, wounding McIntyre, knocking him to the ground and causing him to drop the rifle. Buckley continued to walk toward McIntyre, who was lying still at the time, and continued shooting, hitting McIntyre two more times and from less than seven and one-half feet away (as evidenced by powder burns). Finally, Buckley kneeled down and delivered the fatal shot to McIntyre's head from less than a foot away.

Buckley stated he acted from "instinct"; was in a "subtle state of mind"; a "subconscious state of mind"; and his action was like the "wrath of God coming down on Jim McIntyre" as he began shooting. He testified he shot McIntyre in the head to put him out of his misery.

Buckley was convicted of deliberate homicide, and sentenced to 100 years in prison. On appeal defendant raises five issues for this Court's review:

First is the withdrawal of the instruction on mitigated deliberate homicide after it was given to the jury. This occurred when the jury, after retiring to deliberate, asked for further instruction on the meaning of "extreme mental or emotional stress". The district court judge withdrew the instruction and instructed the jury that only deliberate homicide should be considered by it.

Second did the district court err in failing to dismiss the deliberate homicide charge on defendant's motion at the close of trial.

Third, defendant believes any statements made by him at the suppression hearing, concerning the voluntariness of his written statement, could not be used for impeachment by the state.

Fourth is whether the district court erred in admitting pictures of the deceased over the defendant's objection of irrelevant, gruesome, and prejudicial.

Fifth and finally, defendant questions the impartiality of the jury. He argues his motion for a change of venue based upon pretrial publicity about the defenses raised should have been granted. It was denied after individual voir dire of the jurors as to their knowledge of the case and the defenses to be raised. Defendant also argues the entire panel should have been dismissed because the district court informed the jurors before the individual voir dire that a change of venue could be a frightful expense to the people of Lincoln County.

First, defendant objected to the withdrawal of the instruction covering mitigated deliberate homicide on the grounds the state failed to object to the mitigated deliberate homicide instruction, that as a matter of law mitigated deliberate homicide should be considered as part of the case, and that otherwise the instructions were satisfactory for purposes of making a determination by the jury.

The state and defendant agree State v. Thomas, 147 Mont. 325, 413 P.2d 315, and State v. Taylor, 163 Mont. 106, 515 P.2d 695, set forth the test to be applied. Namely, the district court's instructions must cover every issue or theory having support in the evidence, and the inquiry of the district court must only be whether or not any evidence exists in the record to warrant an instruction on mitigated deliberate homicide.

Therefore, we determine if there was any evidence of extreme mental or emotional stress on the part of defendant presented at trial. We find none. Defendant, himself, stated he was not in shock but was in a "subtle state of mind, a subconscious state of mind." He did not excitedly begin to fire and continue in the same manner, but slowly and deliberately walked, not ran, towards McIntyre. At this time he states McIntyre was not struggling to regain control of his rifle, but was lying there incapacitated. Nevertheless, Buckley shot him twice more from close range, and then knelt down and delivered the fatal shot to the head, to "put him out of his misery." This testimony is incredible. Defendant was not in extreme mental stress, but his actions were that of a slow, deliberate, calm, and cool killer. Thus, the district court was correct in finding there was no evidence of extreme mental or emotional stress.

As to the district court's withdrawal of an instruction, State v. Jackson, 88 Mont. 420, 293 P. 309, sets out the proposition that it is prejudicial error to withdraw a required instruction. As for an improperly given instruction, not required by law, we adopt the rationale of the Supreme Court of Hawaii in State v. O'Keefe, 45 Haw.368, 367 P.2d 91, 94, that a court has the power to, and may, correct errors in its instructions by withdrawing, explaining, or correcting them. This is in accord with the discretion granted a district court in instructing the jury after submission of the case by section 95-1913, R.C.M. 1947.

Second, the district court did not err in denying defendant's motion to dismiss the deliberate homicide charge for insufficiency of the evidence. Section 95-1909(i), R.C.M. 1947, states:

"* * *the court may on its motion or the motion of the defendant, dismiss the action * * *."
(Emphasis supplied).

The statute definitely leaves this determination within the discretion of the district court, and its action will not be disturbed on appeal unless there is an abuse of that discretion. We find no such abuse of discretion, since the state introduced evidence which tended to prove all the elements of deliberate homicide. The fact that some of that evidence could be interpreted to show mitigation does not taint the decision of the district court. The district court properly left it to the jury to decide whether the state's evidence was enough to prove its case beyond a reasonable doubt. Defendant sought to have the district court weigh the evidence presented, which is within the province of the jury, not the court.

Third, defendant cites Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L ed 2d 1247, 1259, as authority that the prosecution cannot use defendant's testimony at a pretrial suppression hearing to impeach the defendant's credibility. Simmons made no such ruling. It held:

> "* * * when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt, unless he makes no objection." (Emphasis supplied).

In Simmons the suppression hearing testimony was used in the prosecution's case-in-chief to show ownership by the defendant of a suitcase containing incriminating evidence. In the instant case, the testimony was used on cross-examination to attack defendant's credibility, by showing he testified before to an entirely different account of the July 4, 1975 homicide, implicating someone other than himself. In no way did this address the guilt of defendant, in fact it spoke to another person committing the homicide. Only the credibility of the defendant was attacked.

Defendant argues this Court should not follow Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L ed 2d 1, because that decision dealt with the Miranda right, and not the assertion of a constitutional right at the suppression hearing, as in this case. However, identical rationale, to guard against perjury, was followed by the United States Supreme Court in Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L ed 503. There the Court allowed physical evidence (narcotics), unlawfully seized and inadmissible in the prosecution's case-in-chief in another case against the same defendant, to be used on cross-examination and introduced to impeach the defendant's direct examination testimony.

Additionally, defendant argues his objection should have been sustained at the suppression hearing because the cross-examination was outside the scope, and such was prejudicial error, since this testimony was used at trial to impeach him. A close examination of the transcript does not bear this out. The testimony used at trial for impeachment purposes was that given by defendant on direct examination and examination by the court, and not cross-examination.

Fourth, defendant alleges pictures of the deceased were erroneously admitted. In State v. Newman, 162 Mont. 450, 460, 513 P.2d 258 and State v. Bischert, 131 Mont. 152, 159, 308 P.2d 969, the Court set forth the rule of law. In Newman the Court stated:

> "'"* * * photographs stand on the same footing as diagrams, maps, plans, and the like, and as a general rule, whenever relevant to describe a a person, place, or thing, they are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case."
>
> "'Photographs that are calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. 20 Am.Jur.,Evidence, § 729, p.609.'
>
> "* * *
>
> "* * *the fact the photographs could tend to arouse sympathy in the minds of the jurors is not the only determinative issue. the probative value of the photographs was never explained to the jury by the medical witness."

In Newman the state's witnesses did not testify to the pictures except to lay the proper foundation through one witness, and then left alone. Such was not the case here. The probative value of the photographs was constantly explained to the jury throughout the trial. This was done (1) by the investigating

- 8 -

officers to demonstrate what they found upon arriving at the scene; (2) by the witnesses who located the body as to where they found it and in what position it was; (3) by a medical witness to discuss the number of shots and the damage done; and (4) by defendant himself. The probative value of these photographs was extensively explained to the court and jury, and such far outweighed their prejudicial effect. We find no error.

Finally, defendant contends a change of venue should have been granted due to pretrial publicity and alternatively the entire panel of jurors should have been dismissed because the district court commented to the jury on the economical effect on the county if a change of venue occurred.

The basis of defendant's motion was pretrial publicity in three newspapers, the Missoulian, the Daily Inter Lake, and the Western News, and a highly publicized poster circulated in the area which described defendant and asked for information as to his whereabouts due to his alleged part in the homicide. As for the newspaper articles, the defense was concerned the jury panel members had been impaneled since September and would find particular interest in any cases upon which they might sit as jurors. Furthermore, one of the three articles described with particularity that the defenses of alibi, insanity, and self-defense were going to be used by the defense. Defendant contended that such information would cause the jurors to believe from the outset that defendant admitted the shooting, but was relying upon self-defense, which in effect takes away the defense option of waiting to see the state's proof before raising self-defense.

However, the district court before seating the jurors performed an individual voir dire of each juror in chambers as to bias and knowledge of the case. Each juror seated stated he or she could render an impartial verdict based upon the evidence presented at trial. This procedure by the district court is in accord with precedent set by this Court. State v. Sheerin, 12 Mont. 539, 31 P. 543; State v. Byrne, 60 Mont. 317, 199 P. 262; State v. Juhrey, 61 Mont. 413, 202 P. 762; State v. White, 151 Mont. 151, 440 P.2d 269. We find no error.

The judgment is affirmed.

_____
Chief Justice

We Concur:

_____

_____

_____
Justices.

_____
Hon. LeRoy L. McKinnon, District
Judge, sitting for Mr. Justice
Wesley Castles.

- 10 -