No. 81-220

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

JOSEPH RAYMOND CARTWRIGHT,

Defendant and Appellant.

---

Appeal from:   District Court of the Nineteenth Judicial District,
               In and for the County of Lincoln
               Honorable Robert Holter, Judge presiding.

Counsel of Record:

   For Appellant:

      David W. Harman argued, Libby, Montana

   For Respondent:

      Hon. Mike Greely, Attorney General, Helena, Montana
      Mike McGrath argued, Assistant Attorney General,
       Helena, Montana
      William A. Douglas, County Attorney, Libby, Montana
      Shawn Thompson argued, Helena, Montana

---

                              Submitted:   June 22, 1982
                              Decided:     August 25, 1982

Filed: AUG 25 1982


_____
                          Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Joseph Cartwright was convicted of deliberate homicide and attempted deliberate homicide following a jury trial in the Nineteenth Judicial District, State of Montana, in and for the County of Lincoln. Cartwright was sentenced to thirty-five years imprisonment on each count; the sentences to run concurrently. From the foregoing conviction he appeals.

Prior to this unfortunate incident the defendant, Joseph Cartwright, and the deceased, Pamela McCully, lived together for almost four years. Their relationship began to deteriorate, and on April 11, 1980, an incident occurred which resulted in the death of Pam McCully and the serious wounding of Pat McCully. That day, Cartwright returned home to find that several of his guns were missing. He learned from a houseguest that Pam McCully had been there earlier and had gained access through a living-room window. Missing were a .308, a .30-30, a .14, a .410 shotgun, and a .357 magnum pistol with holster. Cartwright was angry, and in his anger he "slugged the wall" and created a hole. The houseguest testified that he stated his intentions, "to go up there and see if I can get my guns back and I am going to shoot her."

Pamela McCully and several other members of her family were fifty miles away near Trego at the residence of Retha McCully, Pamela's mother. Cartwright got in his car and drove to Trego. He took with him a loaded .22 caliber semi-automatic rifle, the only gun that had not been taken by Pamela McCully. On the way to Trego, Cartwright consumed three beers. He arrived at approximately 6:00 p.m. He pulled his car into the yard, stopped, and left the motor running. He remained in his car. Pamela McCully came out of the house and the two began to argue. After a few minutes McCully went back in the house to get some cigarettes. She told her mother that "Joe had a gun out there." Nonetheless she went back outside and on the way to Cartwright's

- 2 -

car she picked up a broken cue stick that had been laying in the yard. The two continued to argue. At about this time Bud McCully, his wife Debbie, and their two children came out of the house and were preparing to leave. Cartwright called Bud McCully over to the car and stated, "make her give me my stuff back." Bud McCully did not respond but was irritated by the manner in which his sister Pamela was tapping the broken cue stick on the car. He told her to stop and walked away.

At this point the facts are conflicting. The situation began to move rapidly. Several witnesses testified that Cartwright threatened Pamela McCully; stating "you have got twenty-four hours to live." Pat McCully then approached the car and chastised Cartwright for talking to his sister that way. Pat McCully testified that he then hit Cartwright in the jaw with his right fist. Cartwright reportedly said, "don't hit me Pat." The .22 caliber rifle that had previously been pointing toward the floorboard was pointing out the window. A struggle ensued. Both Pat and Pam McCully were holding on to the barrel. The barrel was "tipped up" and Pat McCully was shot in the stomach. After being shot he scrambled into the house. Then, according to testimony of Retha McCully, "he [Cartwright] just turned the gun on Pam and shot her." She was not holding on to the barrel when she was shot. Retha McCully further testified that when Pamela was shot "her neck went back and she kind of staggered forward and then he shot again and she slumped down on his arm because he had his arm out the window." Blood stains were found on the defendant's left shirt sleeve, on a blanket used to cover the car seat, and on the side of the defendant's car door. A forensic scientist testified that all three blood samples were consistent with Pamela McCully's blood type.

Pamela's death was instantaneous. The bullet transected the upper portion of the spinal cord. The defendant's rifle was loaded with .22 caliber hollow point or "dum dum" bullets. According to testimony "a hollow point bullet, when striking

bone, tends to mushroom and fragment. . .and in this case there was an extensive fragmentation of the bullet structure." Approximately 30 fragments of lead were removed from the neck area.

An instant later, Mike McCully came out of the house with a .308 caliber rifle. He aimed the rifle but Retha McCully pushed his aim into the air as he fired. A neighbor testified that after hearing one loud shot from a heavy-caliber rifle, he heard another volley of small caliber fire; this being Cartwright who stopped at the cattle guard on his way out to fire back at the house. Investigators found .22 caliber shell casings on the ground near the cattle guard.

The defendant's version of the incident varies. The defendant testified that he did not threaten Pamela McCully with the statement that she had twenty-four hours to live; rather he stated "she had twenty-four hours to get my rifles back and I was going to the sheriff." Cartwright further testified that when Pat McCully approached the car he had a pistol in his left hand. He also said that he saw Mike McCully with a rifle prior to the shooting. Cartwright became "scared" and he told Pamela that he "was getting the hell out of there." Pamela responded, "the hell you are." Then the struggle for his .22 caliber rifle ensued. The defendant testified that he attempted to drive away but the car was spinning in the mud. He did not remember firing any shots but he recalls empty casings hitting him in the face. He further testified that the stock of the gun was stuck in the steering wheel as he was driving near the cattle guard and two shots went off.

After leaving the McCully residence Cartwright stopped his car near a gravel pit located 3/4 of a mile from the Trego store. Cartwright testified that he stopped because he had to "go to the bathroom real bad." The State offered another explanation for the stop at the gravel pit; that the defendant stopped to shoot his own car in an attempt to confuse the issues. The defendant's

car sustained a shattered front passenger window and a hole in the left rear section of the roof. Two ballistics experts testified that the hole in the roof was caused by a .22 caliber bullet. Furthermore, two spent .22 caliber cartridges were found by the gravel pit. Testing showed that these had been fired from Cartwright's rifle.

A small pile of glass was found about 3/4 of a mile from the gravel pit. It was analyzed and compared to glass samples taken from the window and interior of Cartwright's car. The two samples had identical chemical and physical properties. The State contends that Cartwright left the gravel pit, went further down the road and shot his own window out. No glass was found at the McCully residence.

Shortly after the incident the defendant turned himself over to the Eureka police; he was "scared" and thought the McCullys would be coming after him. At the police station the defendant made a taped statement to Deputy County Attorney Shaun Thompson and Detective Rodney Deboer. Prior to making the statement, Cartwright was informed of his "Miranda rights," signed a waiver, and answered questions for the investigators.

The defendant raises three issues: (1) whether the District Court erred in failing to suppress statements made to investigators shortly after the incident; (2) whether the District Court erred by refusing the defendant's offered jury instructions on self-defense; and (3) whether it was proper for the District Court to refuse offered character evidence of the victim and her family.

The defendant claims that certain portions of the tape-recorded statement made by him shortly after the shooting should not have been allowed to impeach his testimony. Apparently the State was concerned of possible Miranda violations. In Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court ruled that if an accused asks to consult with an attorney, police questioning must stop. In this

case it is unclear whether the defendant effectively asserted his right to counsel during the interrogation; and if he did, it is equally unclear whether or not he waived that right. At a suppression hearing on this matter, the District Court ruled that the defendant did not effectively assert his right to counsel, and "assuming arguendo that the defendant effectively asserted his right to counsel, he waived his right to counsel by desiring to proceed with the interview." However, we need not address these issues because the taped statement was not used for the prosecution's case-in-chief. Various portions were used but only for impeachment purposes. This is a critical distinction which will become evident shortly. First, it is necessary to show how the taped statement was used.

The defendant testified that he did not recall when the passenger window of his car was shattered. The prosecution played the following portion of the taped statement:

> "A.  I was taking off as it happened and I had my .22 automatic like this, and I grabbed like that, and I turned and that's when my window went out."

Testimony of the defendant indicated that Mike McCully came out of the house with a rifle during the struggle for his .22 caliber rifle. Two portions of the taped statement were played which showed that he was first aware of Mike McCully with the rifle when he was leaving, after the shooting had taken place.

> "A.  I think Pam was hanging on to the window part -- yeah, my window part; my window was rolled down and she was hanging on there.  I fired once or twice then when I was leaving, and I went down and I seen the other brother come out with a rifle with a scope on and I fired once or twice again that way.
>
> " . . .
>
> "Q.  His name is Pat?  A.  Pat.
>
> "Q.    And  --  A.    Blond-haired guy, and the other brother's name is Mike, and Mike, he ran back to the house and he -- as I was going down the hill from the house, he come out with a rifle with a scope on it cause I looked like that and he's going like this."

The defendant also testified that he heard a loud shot just

after he saw Mike McCully with the rifle. The following portion was used in rebuttal.

"Q. Which brother? A. Mike.

"Q. Other than your rifle being fired, do you recall any other weapons being fired? A. No."

Finally, the defendant testified that he did not honk his horn when he drove into the yard. The following portion of the taped statement indicates otherwise.

"Q. When you pulled up, did you beep your horn or something? A. Right.

"Q. You beeped your horn? A. Yes.

"Q. About how many times did you beep your horn? A. Three -- about two times."

After the preceding portions of the statement were admitted the entire statement was played to the jury at the request of the defense. The record makes clear that the objection of the defendant was limited to only those portions of the statement set out above.

This Court has followed the rule of two United States Supreme Court cases. First, in Harris v. New York (1970), 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, the Court held that although evidence is inadmissible in the prosecution's case-in-chief because of Miranda violations, such evidence is not barred for all purposes. In Harris, the defendant had made statements to the police after being taken into custody. A transcript of the statement shows that he was not informed of his right to counsel. The prosecution conceded the Miranda violation but still used the statement for impeachment purposes. The Court in upholding the conviction stated:

> "Miranda barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from Miranda that evidence inadmissible against an accused in the prosecution's case-in-chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." Harris, 401 U.S. at 224.

There is a very good reason for such a rule. The Miranda

shield should not allow an accused to commit perjury. As the Court noted: "[e]very criminal defendant is privileged to testify in his own defense, or refuse to do so. But that privilege cannot be construed to include the right to commit perjury." Harris, 401 U.S. at 225.

Thus Harris allows the use of statements made by an accused for impeachment purposes notwithstanding Miranda violations. Of course there is a danger here. What is to prevent police investigators from willfully violating the principles of Miranda, knowing that evidence obtained can still be used for impeachment? Harris touched on this problem with the language: "provided of course that the trustworthiness of the evidence satisfies legal standards." Harris, 401 U.S. at 224. The Supreme Court addressed the issue in the later case of Oregon v. Hass (1975), 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570. There the Court restated the rule of Harris and went on to say "[i]f, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." Hass, 420 U.S. at 723. Thus, Hass refined Harris by emphasizing the safeguard. The rule of Harris will not allow coercion or duress on the part of police investigators.

As noted above, this Court has adopted the rationale of Harris and Hass and is not persuaded to change a sound rule. In State v. Smith (1975), 168 Mont. 93, 541 P.2d 351, we cited and agreed with both Harris and Hass. We reaffirmed our position in the later case of State v. Buckley (1976), 171 Mont. 238, 557 P.2d 283, where we upheld the use of testimony at a pretrial suppression hearing to impeach the defendant at trial.

The defendant claims that the statements given shortly after the shooting did not meet standards of trustworthiness for several reasons; "the defendant had just arrived from the McCullys. He had blood on his shirt. He had glass splattered

- 8 -

over himself and his car and he thought that the McCullys would be coming after him." However, these facts do not suggest pressure "greater than that on any person in like custody or under inquiry by any investigating officer." Hass, 420 U.S. at 723. Furthermore, there are no facts in this case to suggest any coercion or duress. The defendant came willingly to the Eureka police station. He was read his Miranda rights and signed a waiver. He agreed to make a statement. He was told that he could stop at any time. The investigating officers were very careful to make sure that he understood his rights.

The defendant seems to be placing primary emphasis on a recent case which holds that once a suspect invokes his right to counsel, questioning must stop. This case is Edwards v. Arizona (1981), _____ U.S. _____, 101 S.Ct. 1880, 68 L.Ed.2d 378. In Edwards the defendant was arrested, taken to police head-quarters, and informed of his Miranda rights. He agreed to sub-mit to questioning and learned that another suspect had implicated him. He then gave a taped statement denying any involvement. Then he sought to make a deal. Negotiations broke down and Edwards requested an attorney before any deal was made. The next morning, after listening to the taped statement of the suspect who had implicated him, Edwards admitted involvement in the crime. The trial court admitted the confession as evidence and Edwards was convicted. The Arizona Supreme Court upheld the conviction finding that the waiver and confession were volun-tarily and knowingly made. The United States Supreme Court reversed.

The defendant's reliance on Edwards is ill-founded. The case does not create a new rule to cast doubt on the holdings of Harris and Hass. Edwards restates the rule of Miranda; that if an individual requests an attorney, questioning must stop. The case goes on to address the question of waiver, holding that "a valid waiver of that right cannot be established by showing only that he responded to further custodial interrogation even if he

- 9 -

has been advised of his rights." Edwards, 101 S.Ct. at 1884. Thus the interrogation must cease "unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards, 101 S.Ct. at 1885.

It is clear that the United States Supreme Court did not intend to change the rule of Harris or Hass, rather they intended to devise and define a test concerning waiver of the right to counsel. The question before this Court is not a waiver question and we do not intimate an answer to any such question. Edwards is of no help. Harris and Hass and our own cases of Smith and Buckley are on point. The District Court did not err by allowing portions of the statement for impeachment.

Next the defendant claims he was entitled to jury instructions on self-defense. Defendant correctly cites the fundamental rule found in Buckley, that "the district court's instructions must cover every issue or theory having support in the evidence, and the inquiry of the district court must only be whether or not any evidence exists in the record to warrant an instruction. . ." Buckley, 171 Mont. at 242, 557 P.2d at 285; State v. Gopher (1981), ____ Mont. ____, 633 P.2d 1195, 38 St.Rep. 1521; State v. Sorenson (1980), ____ Mont. ____, 619 P.2d 1185, 37 St.Rep. 1834; State v. Bouslaugh (1978), 176 Mont. 78, 576 P.2d 261. The Montana legislature has statutorily adopted rules for the defense of self defense or more accurately, justifiable use of force. As a general rule,

> "A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or to prevent the commission of a forcible felony." Section 45-3-102, MCA.

However the use of force described above is not available to an aggressor. If an individual is an aggressor the following

rule applies.

> "The justification described in 45-3-102 through 45-3-104 is not available to a person who:

> "(1) is attempting to commit, committing, or escaping after the commission of a forcible felony; or

> "(2) purposely or knowingly provokes the use of force against himself, unless;

> "(a) such force is so great that he reasonably believes that he is in imminent danger of death or serious bodily harm and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or serious bodily harm to the assailant; or

> "(b) in good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force but the assailant continues or resumes the use of force." Section 45-3-105, MCA.

The Commission's comments to 45-3-105 make it clear that "the preceding sections of this chapter has assumed that the person using force. . .has not otherwise provoked such force. This section concerns the much more limited right which a person has to defend himself, when he has committed an unlawful act or otherwise provoked the use of force."

The facts in this case clearly indicate that the defendant was an aggressor. After finding his guns had been taken he drove fifty miles with a loaded .22 caliber rifle. Before leaving he told a houseguest that "he was going to go up there and get his guns and shoot her." While at the McCully residence he threatened Pamela McCully by stating "you have 24 hours to live." These facts certainly establish the defendant as an aggressor, consequently the affirmative defense of justifiable use of force would apply only in two situations. First, if such force was so great that he reasonably believed he was in danger of death or serious bodily harm and he exhausted every reasonable means of escape. Here the defendant stayed in his car with the motor running. He was parked for an easy exit. Even if we assume the defendant was in fear of his life or being seriously injured,

which seems doubtful in view of the fact that when Pamela McCully was shot, at most she was armed with a broken cue stick, it is clear that he did not exhaust his means of escape. Prior to the actual shooting the defendant had ample opportunity to leave. In his own words he was "scared" even before arriving at the McCullys, yet during the ten to fifteen minutes he was there he made no attempt to leave.

Second, the defense would have been available if in good faith he withdraws from physical contact and clearly indicates a desire to terminate the use of force. Clearly the facts will not support the defendant's withdrawal. After Pat McCully was shot, he could have devoted all of his energies to escape and withdrawal from the fight, rather he turned the gun on Pamela and fired. Furthermore, when he reached the cattle guard he fired several more shots at the house. Such actions are certainly not indicative of an intent to withdraw. We find no error in the trial court's refusal to allow an instruction on self-defense.

Finally the defendant appeals the trial court's refusal to allow evidence concerning threats made by the victims and their family. The defendant's offer of proof shows the intention to introduce the following:

1. That Pamela McCully made threats toward the defendant, stating that she was going to kill him;

2. That he had seen Mike and Pat McCully fighting, that Pat was kicking Mike in the head and Pat had to be restrained from further acts of violence; and that at that time Pat actually stepped on Pam's foot and twisted her foot to the point where you could hear a snap in the foot area;

3. That an incident occurred in a bar and both Pat and Mike were present, that Mike made physical contact with the defendant and made the comment "some day Joe, some day;"

4. That the day before the shooting incident, Pamela McCully had followed him with a gun, she was in her car and she was brandishing a gun at the defendant; and

5. That recently Retha McCully had threatened the defendant, saying that if she ever caught the defendant with Pamela again she would blow his head off or have one of the boys do it.

A recent case is directly on point. In State v. Breitenstein (1979), 180 Mont. 503, 591 P.2d 233, we had a similar situation. The defendant was convicted of aggravated assault for drawing a .22 caliber pistol and threatening to blow the victim "full of holes like a sieve." Long before this incident, the defendant and victim had been on poor terms. The defendant wanted to introduce evidence of past threats made by the victim and his mother-in-law. The trial court rejected the evidence for lack of foundation. We affirmed. The applicable rule of evidence is Rule 404(a)(2), Mont.R.Evid., which states:

> "(a) Character evidence generally. Evidence of a person's character or trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> ". . .
>
> "(2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case or in an assault case where the victim is incapable of testifying to rebut evidence that the victim was the first aggressor."

The comments to the rules are more succinct: "[u]nder Montana case law the accused must first lay a foundation that he acted in self defense before he can introduce evidence of the violent character of the victim." An indispensible component to the foundation of self-defense was stated in State v. Logan (1970), 156 Mont. 48, 65, 473 P.2d 833, 842: "[u]ntil such time as defendant took the stand and admitted the killing, the issue of self defense was not joined at the trial. Thus, no foundation existed for the admission of the testimony." In this case too, the proper foundation was absent. The defendant did not admit the killing, rather he states that he does not remember firing any shots, only empty casings hitting him in the face. The trial

court did not err in refusing the offered character evidence. For the reasons stated herein, we affirm the District Court's judgment.

_John Conway Harrison_
Justice

We concur:

_Frank L. Haswell_
Chief Justice

_____

_____

_Gene B. Daly_
Justices

Mr. Justice Frank B. Morrison, Jr., specially concurring:

I concur in the result but not with the entire rationale of the majority opinion.

With respect to Issue No. 2, concerning whether it was error to deny defendant's offered instruction on self-defense, I would reach the same result, but for a different reason. The defendant here did not rely upon self-defense. Defendant's version of the incident was that the gun accidently discharged. Under these circumstances, it was not error for the District Court to refuse the self-defense instruction.

I take issue with the majority's position that the defendent was not entitled to a self-defense instruction because defendant was shown to be the aggressor. Under defendent's version of the facts, he was not the aggressor and would be entitled to an instruction on his theory. However, because he did not rely upon self-defense it was not error for the trial court to refuse to give such an instruction.

I would affirm.

_____
Justice

I join in the specially concurring opinion of Justice Morrison:

_____
_____
Justices

-15-