FILED

July 21 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0020

DA 13-0020

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 202

STATE OF MONTANA.

        Plaintiff and Appellee,

  v.

R.S.A.,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 11-452
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Eileen A. Larkin, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Assistant Appellate Defender, Helena, Montana

          Kirsten Pabst, Missoula County Attorney, Jennifer Clark, Deputy County Attorney, Missoula, Montana

      For Amicus:

          Mark L. Stermitz, Crowley Fleck, PLLP, Missoula, Montana

          James Park Taylor, ACLU of Montana Foundation, Missoula, Montana

Submitted on Briefs: April 8, 2015
Decided: July 21, 2015

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1     R.S.A. was convicted of felony robbery following a jury trial in August 2012.  He appeals his conviction and asserts that it should be vacated.  We affirm.

## ISSUES

¶2     A restatement of the issues on appeal is:

¶3     Was R.S.A. subject to pretrial punishment in violation of his due process rights as a result of a District Court order issued following a "critical stage" hearing at which R.S.A. was not present?

¶4     Was sufficient evidence presented at trial to support R.S.A.'s conviction of felony robbery?

¶5     Did the District Court err in ruling that R.S.A.'s reliance on the affirmative defense of justifiable use of force required R.S.A. to testify at his trial?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     R.S.A., currently in his mid-twenties, has a lengthy documented history of mental issues, substance abuse, and institutionalization.  He is prescribed medication to stabilize his moods and treat his mental health condition but compliance has been an ongoing problem.  His juvenile record contains multiple misdemeanor offenses as does his adult criminal history.  The incident that triggered the case before us occurred on September 22, 2011, when R.S.A. entered the Ace Hardware at Tremper Plaza in Missoula, Montana, and stole a tool set.  An Ace store manager witnessed R.S.A. leaving with the merchandise and asked R.S.A. to present the receipt of purchase.  R.S.A., later claiming that he did not hear the manager, quickly exited the store and began to run when two Ace employees began chasing

2

him. He dropped the merchandise shortly after leaving the store but kept running. One employee continued the chase while the other recovered the stolen merchandise and returned it to the hardware store.

¶7      Yet another Ace employee, Bob Pedersen, who was in his vehicle outside of Ace, witnessed R.S.A. running and his co-worker, Tyler Anderson, chasing him. Pedersen decided to assist Anderson and began to chase R.S.A. using his vehicle. Additionally, John Nichols was driving into the parking lot to shop at the Ace Hardware when he observed the Ace employees chasing R.S.A. Nichols joined the pursuit in his pickup truck, picking up Anderson a few blocks away and finally catching up with R.S.A. Pedersen arrived in his vehicle shortly thereafter.

¶8      While Anderson called the police to report their location, Nichols tackled R.S.A. and both Nichols and Pedersen restrained R.S.A. on the ground. R.S.A. struggled to get free, claiming that Nichols was choking him and that he could not breathe. During the struggle, R.S.A. hit Nichols in the eye, kicked Pedersen in the chest, and repeatedly spit at both men. Nichols and Pedersen released R.S.A. shortly before the police arrived. Upon being released, R.S.A. saw an X-acto knife in the grass. He grabbed the knife and held it out, threatening Nichols and Pedersen with injury if they attempted to touch him again. R.S.A. then walked away and as the police surrounded him, he sat on the curb and submitted to his arrest.

¶9      Pedersen, Nichols, Anderson, and one of the responding officers returned to Ace Hardware at which time Nichols discovered that his leg was cut and bleeding. He reported the cut to the officer and then went to the hospital for treatment. His medical bills totaled

3

approximately $877.00, $471.00 of which was Nichols' responsibility and not covered by insurance.

¶10 Following R.S.A.'s arrest, bail was set in justice court at $10,000 and paid on September 28, 2011. He was charged by Information with felony robbery on October 7, 2011. On October 11, counsel with the Office of the State Public Defender was assigned to represent R.S.A. The court arraigned R.S.A. on November 1 and R.S.A. entered a plea of "not guilty." At the omnibus hearing on November 15, R.S.A. indicated that he would rely on the affirmative defense of justifiable use of force (JUOF). On January 24, 2012, he filed written notice of his intention to introduce evidence of JUOF at trial.

¶11 On March 14, 2012, Missoula City Police responded to a potential suicide call. They arrived at R.S.A.'s residence and found R.S.A. intoxicated—in violation of the conditions set at the time of his release on bond—and took him into custody for a mental health exam. R.S.A. injured a nurse by kicking her in the face while at the hospital. The State sought and obtained a bench warrant, which allowed for a $15,000 bail. At a status conference on March 20, 2012, the District Court ordered that R.S.A. be taken into custody until the hearing on the State's Petition to Revoke held on March 21, 2012. At the revocation hearing, the court ordered that R.S.A. be evaluated at the Montana State Hospital (MSH) for a determination of whether he was fit to proceed.

¶12 On April 18, 2012, while R.S.A. was still undergoing evaluation at MSH, the District Court conducted an emergency hearing (hereinafter the "transport hearing") to determine whether R.S.A. should remain at MSH or be returned to the Missoula County Detention Center (MCDC). Counsel for the State and R.S.A. were present but R.S.A. was not, having

4

been placed in full bed restraints at MSH five days earlier. During this hearing Dr. Virginia Hill, R.S.A.'s hospital psychiatrist, reported that because of R.S.A.'s abusive, threatening, and violent behavior, MSH was not able to complete the evaluation or prevent R.S.A. from harming himself or others. Dr. Hill requested that R.S.A. be returned to MCDC where he could be confined in a "restraint chair" or "shackled and chained in a cell." She reported that she was "not seeing evidence of a mental disease," rather "just . . . an angry man . . . who's abusing staff." She noted that MCDC had tools "like Tasers, pepper spray, handcuffs, chair restraint, [and] leg irons" that may help "manage" R.S.A.'s behavior. She asserted that physically restraining R.S.A. would be more humane than chemical restraint. Hill also claimed that she could complete her evaluation of R.S.A. while he was being held in the Missoula County facility. R.S.A.'s counsel did not object to any of Dr. Hill's comments or recommendations but stated "I take it at face value that he is a threat to safety and something needs to be done." At the close of the hearing, and despite the Missoula County sheriff's opposition, the District Court ordered that R.S.A. be transported to MCDC. R.S.A. was thereafter returned to MCDC and was subsequently released upon payment of $15,000 bond. On May 10, 2012, the court presented counsel with MSH's mental evaluation. The report concluded that R.S.A. was fit to proceed.

¶13 Defense counsel sought a second evaluation from Dr. Paul Moomaw, a licensed clinical psychologist. Between April 30 and May 28, 2012, Dr. Moomaw met with and evaluated R.S.A., concluding in his May 29, 2012 report that R.S.A. has suffered from a serious mental/emotional disorder since childhood. Dr. Moomaw speculated that R.S.A. had cyclothymic disorder, i.e., "a mood disorder which markedly affects daily functioning."

5

¶14 R.S.A. remained out of jail until June 1, 2012, when his bondsmen took him to MCDC after learning that he was violating the terms of his release. R.S.A. did not have his medications with him and injured himself during a severe psychotic breakdown while being detained. At a June 5 status conference, R.S.A. was released to his father subject to specific restrictions. On June 13, 2012, the State petitioned the court to revoke R.S.A.'s release on bond and to issue a warrant for his arrest. The State alleged that R.S.A. had been arrested on May 19 for criminal trespass and theft, was being investigated for a burglary that took place on May 27, 2012, and was accused of striking a man in the head with a machete on June 12, 2012. The District Court issued a bench warrant on June 13 and set bail at $200,000. R.S.A. was arrested and detained at MCDC. During June and July 2012, multiple status conferences were conducted, all of which R.S.A. attended via video conference from MCDC.

¶15 On August 1, 2012, the District Court conducted a jury trial. R.S.A. exercised his constitutional right not to testify. As the trial drew to a close, counsel for the State challenged R.S.A.'s reliance upon the affirmative defense of JUOF. The State claimed that in order to meet the burden required of a JUOF defense, R.S.A. must present sufficient evidence to support his claim and therefore must testify. R.S.A. objected but the District Court agreed with the State and R.S.A. took the stand. Following deliberations, the jury rendered a guilty verdict. The District Court conducted a sentencing hearing on November 2 and 7, 2012, and R.S.A. was sentenced to 30 years in Montana State Prison, with 20 years suspended. He was also given credit for 199 days served in custody.

¶16 R.S.A. filed a timely appeal and asserts that his conviction should be vacated. In the alternative, he requests that we remand for a new trial.

## STANDARD OF REVIEW

¶17 This Court generally does not address issues raised for the first time on appeal. However, when a criminal defendant's fundamental rights are invoked, we may choose to review a claim under the common law plain error doctrine where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79 (citations omitted). Plain error review is discretionary, and we apply it on a case-by-case basis. *State v. Chafee*, 2014 MT 226, ¶ 12, 376 Mont. 267, 332 P.3d 240 (citation omitted).

¶18 When reviewing a criminal conviction for sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Beaudet*, 2014 MT 152, ¶ 11, 375 Mont. 295, 326 P.3d 1101 (citation omitted). Moreover, we review de novo evidentiary rulings based upon interpretation of a statute. Other evidentiary rulings are reviewed for abuse of discretion. *State v. Daniels*, 2011 MT 278, ¶ 11, 362 Mont. 426, 265 P.3d 623.

## DISCUSSION

¶19 *Was R.S.A. subject to pretrial punishment in violation of his constitutional due process rights as a result of a District Court order issued following a "critical stage" hearing at which R.S.A. was not present?*

¶20 R.S.A. claims that MCDC unlawfully kept him in restraints and solitary confinement for approximately five months, beginning in June 2012—approximately six weeks before his August 1 trial—and until his sentencing in November 2012. He asserts that during the

transport hearing conducted by the District Court on April 18, 2012, the court sanctioned this use of pretrial punishment by MCDC and that his counsel was ineffective for failing to advocate for his right to be free from such punishment. He concedes, however, that between June 2012 and his sentencing in November 2012, the MCDC staff documented more than 300 incidents of inappropriate, violent, or threatening behavior involving at least twenty different officers, nurses, and doctors, including, but not limited to, spitting, vandalizing his cell, smearing feces on the wall, ripping cameras from the cell wall, throwing food, refusing his meds, verbally abusing staff, and ultimately harming himself. He nonetheless claims, as does the ACLU of Montana in its amicus brief, that being kept in solitary confinement or in restraints prior to his conviction constitutes pretrial punishment and a violation of his due process rights.

¶21 Additionally, R.S.A. argues that the transport hearing was a critical stage of his criminal proceeding and the District Court violated his right to be present by conducting the hearing without his knowledge or presence. He maintains that he was prejudiced by his absence. He acknowledges that he did not raise any of these issues in the District Court either prior or subsequent to his trial, but urges us to invoke plain error review of his claims.

¶22 The State counters that R.S.A.'s pretrial punishment claim is vexatious and raised for the first time on appeal; therefore, it should be dismissed with prejudice. It also asserts that plain error review is not appropriate because R.S.A. had other available remedies to seek redress of his claims for pretrial punishment, such as habeas corpus or a civil action against MCDC.

¶23    We decline to exercise plain error review. Because these claims were never raised in the District Court, the court did not have an opportunity to address them. Consequently, there is no decision of the court to review and no identifiable "plain error." As the State observes, R.S.A. could have filed a habeas proceeding or initiated a civil action against MCDC for violation of his civil rights as he has done in the past. Lastly, R.S.A. has not established that his failure to raise these claims in the District Court has resulted in a manifest miscarriage of justice compromising the fundamental fairness of his trial or the integrity of the judicial process. *Taylor*, ¶ 14; *State v. White*, 2014 MT 335, ¶ 36, 377 Mont. 332, 339 P.3d 1243. We therefore reject R.S.A.'s request to dismiss his conviction or remand for re-trial on this basis.

¶24    *Was sufficient evidence presented at trial to support R.S.A.'s conviction of felony robbery?*

¶25    Section 45-5-401, MCA, sets forth the relevant elements of robbery:

> (1)  A person commits the offense of robbery if in the course of committing a theft, the person:
> (a)  inflicts bodily injury upon another;
> (b)  threatens to inflict bodily injury upon any person or purposely or knowingly puts any person in fear of immediate bodily injury; or
> (c)  commits or threatens immediately to commit any felony other than theft.
> .  .  .
> (3)  "In the course of committing a theft", as used in this section, includes acts that occur in an attempt to commit or in the commission of theft or in flight after the attempt or commission.

Section 45-6-301(1)(a), MCA, provides that:

> A person commits the offense of theft when the person purposely or knowingly obtains or exerts unauthorized control over property of the owner and has the purpose of depriving the owner of the property.

¶26 R.S.A. argues that his robbery conviction cannot be sustained because he "did not place anyone in immediate danger when he took the tool set, nor did he take it by force or threat of force." He relies on *State v. Case*, 190 Mont. 450, 621 P.2d 1066 (1980) for the proposition that the ensuing flight is considered part of a robbery until such time as the criminal purpose is completed. He claims that his "criminal purpose" of taking the tool set was completed when he abandoned the spoils outside of Ace Hardware and that the remainder of his pursuit by Nichols, Anderson, and Pedersen was not part of the commission of theft, and therefore cannot elevate his admitted theft to robbery. R.S.A. also asserts that Nichols, Anderson, and Pedersen were not authorized to detain him under § 46-6-506, MCA, which allows a merchant to temporarily detain a suspected thief.

¶27 The State argues that the evidence at trial unequivocally established through R.S.A.'s admissions and the testimony of eye witnesses that R.S.A. committed theft and fled while being pursued because people were trying to "apprehend" him for "theft." Additionally, R.S.A. admitted, as corroborated by Nichols, Pedersen, and Anderson, that while R.S.A. was "running" after committing theft, he injured or threatened to injure the men.

¶28 R.S.A.'s contention that his "flight" ended when he abandoned the tool set is belied by the plain language of the statute. Section 45-5-401(3), MCA, expressly provides that the phrase "'in the course of committing a theft' includes acts that occur . . . in flight after the attempt or commission." R.S.A. fled after stealing the tool set and his flight did not end until the police apprehended him. The statute does not provide that "theft" ends at the time the thief abandons the stolen goods. Clearly, R.S.A. was in flight after the commission of theft,

10

and the injuries he inflicted on Nichols and Pedersen, as well as his threats of injury to all three men, fall squarely within the definition of robbery.

¶29 We decline to address R.S.A.'s § 46-6-506, MCA, claim that he was unlawfully detained by Nichols and Pedersen as he raised this claim for the first time on appeal. *State v. Longfellow*, 2008 MT 343, ¶ 19, 346 Mont. 286, 194 P.3d 694.

¶30 We conclude, based upon the evidence presented to the jury and viewed in the light most favorable to the prosecution, that the jury could have found the essential elements of the robbery beyond a reasonable doubt.

¶31 *Did the District Court err in ruling that R.S.A.'s reliance on the affirmative defense of justifiable use of force required R.S.A. to testify at his trial?*

¶32 As noted above, R.S.A. filed a notice in the District Court that he intended to rely upon the affirmative defense of justifiable use of force as required by § 46-15-323(2), MCA. This defense later triggered a proposed JUOF jury instruction. It is well-established in Montana's jurisprudence that a defendant has the initial burden of offering "evidence of justifiable use of force." *Daniels*, ¶ 15. Section 46-16-131, MCA, provides that "In a criminal trial, when the defendant has offered evidence of justifiable use of force, the state has the burden of proving beyond a reasonable doubt that the defendant's actions were not justified." Moreover, § 26-1-401, MCA, states "The initial burden of producing evidence as to a particular fact is on the party who would be defeated if no evidence were given on either side. Thereafter, the burden of producing evidence is on the party who would suffer a finding against that party in the absence of further evidence."

¶33 R.S.A. and counsel made the strategic decision that R.S.A. would exercise his constitutional right to refrain from testifying at his trial. However, as the defense rested, the

11

State challenged R.S.A.'s JUOF defense and the proposed jury instruction, claiming that because he had not admitted to stabbing, punching, and/or kicking his pursuers, he had offered no evidence to support a justifiable use of force defense. Counsel for R.S.A. asserted that defendant's burden had been met during her cross-examination of the State's witnesses, which raised a reasonable doubt as to whether R.S.A. was acting in self-defense. Counsel claimed the burden had thus shifted to the State to prove that R.S.A. was not acting in self-defense. The District Court disagreed and held that for the burden to shift, the defendant must first admit the offense. The following colloquy illustrates the court's concern and rationale:

> R.S.A. counsel: There's certainly enough evidence here that my client was being restrained and was resisting and fighting the restraints; that once he was released he quietly sat down by a police car. That's enough information for the jury to conclude that he was responding to the force, and that what he was doing was reasonable in light of the fact that these guys didn't even have Ace uniforms on and were being too excessive.
>
> Court: I don't think you've [sic], as a matter of evidence, have shifted the burden.
>
> R.S.A. counsel: Okay, Judge. I hear your ruling and I respect the [c]ourt. I just want to say, for the record, that I think you've placed the defendant now in a position of having to waive his Constitutional right not to testify in order to satisfy this preliminary showing of evidence of justifiable use of force. And I object.
>
> Court: Well, I understand. But I think . . . you can't have it both ways. . . . [Y]ou're either going to say, I didn't do it at all; or, They misinterpreted what was going on; or If I use force, it was justified. But I think if you're going to do that, you're going to have to admit that you used the force. You can't argue both ways on an affirmative defense. . . . I think you need to put on more than what you've done through cross-examination.

¶34 Thereafter R.S.A. took the stand and testified that he punched Nichols in the head and kicked Pedersen in the chest in his efforts to escape their restraints. He denied stabbing

12

Nichols with the X-acto knife. The court ruled that R.S.A. had met his burden and the burden shifted to the State. R.S.A. now appeals the court's ruling requiring that he testify, and its conclusion that, prior to his testimony, there was insufficient evidence offered by way of cross-examination of the State's witnesses to place the defense before the jury. The State counters that the District Court correctly interpreted § 46-16-131, MCA, and our decision in *Daniels*.

¶35 In *Daniels*, Daniels and his adult son, both intoxicated, became embroiled in a heated argument on the evening of May 21, 2009. *Daniels*, ¶¶ 5-6. During the argument, Daniels retrieved a handgun and shot his son. *Daniels*, ¶ 7. He called 9-1-1 and told the dispatcher what he had done. *Daniels*, ¶ 8. He was charged with deliberate homicide which was later amended to mitigated deliberate homicide. He pled not guilty and noticed his intent to rely on JUOF. The State argued that Daniels should not be able to argue that his son had a violent nature without first laying a proper foundation. *Daniels*, ¶ 10. The trial court agreed and required Daniels to testify in order to lay such a foundation in support of his JUOF defense. Daniels testified and offered sufficient evidence to raise the defense and the jury was instructed accordingly. *Daniels*, ¶ 16, n3. Daniels was convicted and he appealed. *Daniels*, ¶ 10.

¶36 Daniels argued on appeal that the district court misinterpreted newly-enacted legislation pertaining to JUOF that had gone into effect on April 27, 2009. *Daniels*, ¶ 13. In addressing the new legislation, we observed that "[u]nder prior law, the State bore the burden of proving the elements of the charged offense beyond a reasonable doubt, but it did not need to prove 'the absence of justification.'" *Daniels*, ¶ 13. We also noted, however, that the

new legislation did not change § 45-3-115, MCA, which continued "to provide that JUOF is an affirmative defense, which we have defined as 'one that admits the doing of the act charged, but seeks to justify, excuse or mitigate it.'" *Daniels*, ¶ 15. We further explained "[i]f the defendant offers no evidence, then he fails to satisfy his initial burden and the defense fails." *Daniels*, ¶ 15. We noted that in *State v. Cartwright*, 200 Mont. 91, 104, 650 P.2d 758, 765 (1982), we held that "the accused must first lay a foundation that he acted in self defense before he can introduce evidence of the violent character of the victim." Applying *Cartwright* and other relevant cases, we concluded that the district court did not err in requiring Daniels to lay a proper foundation by testifying. We stated "Given the circumstances here, the court properly determined that Daniels' testimony was necessary to provide the requisite foundation for the evidence of [his son's] past which he initially intended to offer. Daniels fails to specifically demonstrate how the foundation for his proffered evidence could have otherwise been established, and therefore, we need not address whether the foundation could have been alternatively laid." *Daniels*, ¶ 28. Notably, we did not say in *Daniels* that it is impossible for a defendant to lay a foundation for the defense without testifying; we simply said that the defendant had not done so in that case.

¶37 Similarly, here, the District Court concluded that defense counsel's cross-examination of the State's witnesses was insufficient to lay the foundation for the JUOF defense because the court believed R.S.A. was still essentially denying he had used any force during the confrontation. In making this determination, the court properly relied on the relevant statutes and our decision in *Daniels*. Under the facts of this case, the ruling was neither incorrect nor an abuse of the court's broad discretion.

14

## CONCLUSION

¶38    For the foregoing reasons, we affirm R.S.A.'s conviction.


                                        /S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE