**STATE of Utah, Plaintiff and Appellee,**

v.

**Ronnie Lee GARDNER, Defendant and Appellant.**

No. 21027.

Supreme Court of Utah.

Jan. 31, 1989.

Rehearing Denied Nov. 15, 1989.

274

**276**

Andrew A. Valdez, James A. Valdez, Joan C. Watt, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Sandra L. Sjogren, Kimberly K. Hornak, Salt Lake City, for plaintiff and appellee.

HOWE, Associate Chief Justice:

Defendant appeals his convictions of first degree murder, Utah Code Ann.[1] § 76–5–202(1)(c), (e), & (h); attempted first degree murder, § 76–5–202(1)(e), (h), & (k); aggravated kidnapping, § 76–5–302(1)(a), (b); escape, § 76–8–309; and possession of a dangerous weapon by an incarcerated person, § 76–10–503(2).

The charges stem from an incident that occurred on April 2, 1985. Defendant was being transported from the maximum security unit of the Utah State Prison to the Metropolitan Hall of Justice in Salt Lake City to appear at a hearing on a second degree murder charge. As he entered the basement lobby of the Hall, he was handed a gun by a female accomplice. He fumbled with the unfamiliar weapon; his guards retreated to the parking lot. Gunfire was exchanged, and defendant was shot in the shoulder. He entered an archives room, looking for a way out of the building. There he encountered a court clerk, a prison officer, and three attorneys. Two of the attorneys sought refuge behind the office door. Defendant turned on them, pointed the gun at one and then the other, and fired, killing attorney Michael Burdell.

The prison officer, Richard Thomas, was forced to lead defendant out of the archives room to a stairwell leading to the second floor. As defendant crossed the lobby, Nick Kirk, a uniformed bailiff, came down the stairway to investigate the disturbance. Defendant shot and seriously wounded Kirk and then proceeded up the stairs. On the next floor, defendant encountered Wilburn Miller, a vending machine serviceman, and forced him to accompany defendant outside of the building. As defendant stepped outside, Miller broke free and dived through a teller's window inside the building. Once outside, defendant, wounded, shackled, and surrounded by police, threw down his gun and surrendered.

Defense counsel filed pretrial motions seeking a change of venue, recusal of the trial judge, and a prohibition on evidence of other crimes committed by defendant. The first two motions were denied. The third was granted with the understanding that some evidence of prior crimes was necessary to prove elements of the offenses charged and other evidence of defendant's past record would be admissible as impeachment if defendant took the stand.

At trial, the defense moved for a mistrial based on the amount of security in the courtroom. The motion was denied, and the four plainclothes guards and defendant were directed to remain seated until the jury left the courtroom. The prison officer who had led defendant to the stairwell had made a pretrial statement that defendant was "glassy-eyed." However, on direct testimony, he characterized defendant as "being all there." After the defense had brought out the previous statement on cross, the trial court stopped both counsel from going back over that aspect of the testimony on recross, stating, "I think it has been developed by both of you as to what was said."

On cross-examination, defendant denied having a conversation with Wayne Jorgensen, a prison officer assigned to guard him while he recovered at the hospital. On rebuttal, the prosecution called Jorgensen, who recounted the content of his conversation with defendant. While no objection was raised at trial, defendant now contends that the statements were taken without benefit of a *Miranda* warning and violated his fifth and sixth amendment rights.

During the penalty phase of the trial, defendant, in an attempt to give the jury a basis on which to assess the proportionality of the penalty which should be imposed,

---

1. All statutes cited are to Utah Code Annotated (1953).

sought the admission of affidavits of attorneys who had been involved in other capital homicide cases. The court refused to admit the affidavits. It also declined to accept testimony by associates of the victim regarding their opposition to the death penalty.

At the close of the penalty phase, defendant moved for a mistrial on the basis of prosecutorial misconduct. The motion was denied. The jury, which had previously returned a verdict of guilty on all counts, sentenced defendant to death. He appeals.

## I. Change of Venue

Defendant contends that the trial court abused its discretion in denying him a change of venue. He maintains that due to extensive pretrial publicity and the fact that his trial was held in the county courthouse across the street from the Hall, it was impossible for him to receive a fair trial in Salt Lake County.

▇▇▇▇ Due process requires that the accused receive a trial before a fair and impartial jury, free from outside influences. *State v. Pierre*, 572 P.2d 1338, 1348 (Utah 1977), *reh'g denied*, 576 P.2d 857 (Utah 1978), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961). The fact that a case is prominently reported in the news media, standing alone, does not presumptively deprive a defendant of due process. *State v. Pierre*, 572 P.2d at 1349. Defendant points to the fact that nearly all of the prospective jurors had been exposed to at least the fundamental facts of the incident. However, neither does that exposure presumptively deprive a defendant of due process. *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 594 (1975). In examining the news reports in evidence and more than 700 pages of transcript of the *voir dire*, it is apparent that the news reports did not infect the minds of jurors with any prejudice or bias against defendant. The following comment was made by a juror at *voir dire:* "I don't recall them [the media] giving any details involving the case that we haven't already discussed, that the judge didn't talk about on the initial day we came in." This is indicative of the impression the media reports made on the prospective jurors. They were aware of the basic circumstances, that is, someone had handed defendant a gun, one person was killed, and defendant and another person were injured. Such knowledge was not prejudicial in any way to defendant, however, because these basic facts were not disputed or placed at issue by defendant and were established through his own direct testimony.

Defendant carries the argument one step further and argues that not only was knowledge of the incident widespread in the community, but there was a common belief that he was guilty, which precluded any possibility of his obtaining a fair trial in the jurisdiction. In support, defendant took a telephone poll of 400 registered voters in Salt Lake County. (Jury lists are drawn from registered voters.) He asserts that the poll showed that 78 percent thought that defendant was guilty and 12 percent thought that he was probably guilty. The results of the survey are misleading in several aspects. First, only 23 percent of those surveyed could identify defendant as the person involved in the incident. Second, when asked if he was "guilty," no explanation was given of the charges. Therefore, any lay opinion as to guilt was merely an affirmation that he was the person involved in the incident, a fact conceded by the defense. This is typified by the following comment from a potential juror on *voir dire:* "From the news accounts you just, you know, it kind of shows that he was there and he did it, but, you know, I don't know that I sat and thought 'He is guilty.'"

We subscribe to the following:

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a ver-

dict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642. Each one in the pool of prospective qualified jurors stated under oath and rather candidly that he or she could meet this standard.

Defendant contends that the proximity of the trial to the scene of the crime also required a change of venue. However, he does not contend that there were any unauthorized jury views of the scene, nor does he identify any specific prejudice. The trial was moved from the Hall to a separate building and courtroom. The danger that any prejudice would result because the trial was held at that location was not so great that a change of venue was required. Having carefully reviewed the record, we cannot say that a change of venue was necessary to insure defendant a fair and impartial jury. Denial of a change of venue was not an abuse of discretion. *See State v. Bishop*, 753 P.2d 439, 459 (Utah 1988).

## II. Recusal

■ Defendant filed an affidavit of bias and prejudice against the trial judge because he worked in the Hall. On appeal, defendant does not allege any actual bias but argues that a trial judge *should* recuse himself where there is an *appearance* of bias. We agree. The canons of judicial ethics state that a judge *should* disqualify himself where his impartiality might reasonably be questioned. Code of Judicial Conduct Canon 3(C)(1) (1972). If the allegations in the affidavit are true and they would give a reasonable person cause to doubt whether the judge could be impartial under the circumstances, he *should* recuse himself. Nothing is more damaging to the public confidence in the legal system than the appearance of bias or prejudice on the part of the judge. However, though we share defendant's statement of the controlling rule, we do *not* agree that the failure of the trial judge to recuse himself in the instant case requires reversal. The Code of Judicial Conduct establishes standards that, if violated, may subject a judge to discipline. However, it does not establish the parameters of a defendant's constitu-

tional right to a fair trial. *State v. Neeley*, 748 P.2d 1091, 1094 (Utah 1988); *Harvell v. State*, 742 P.2d 1138, 1140 (Okla.Crim.App. 1987); *State v. Wixon*, 30 Wash.App. 63, 69, 631 P.2d 1033, 1038 (1981).

■ Failure of a trial judge to recuse even where he should have, based on the appearance of possible bias or prejudice, does not require reversal unless the "substantial rights of the party are affected." Utah R.Crim.P. 30. The test for harmless error under the just-quoted language from rule 30 is whether "there was a reasonable likelihood of a more favorable result for the defendant." *State v. Hutchison*, 655 P.2d 635, 637 (Utah 1982); *State v. Knight*, 734 P.2d 913, 918–20 (Utah 1987). No allegation of actual prejudice was made, nor does our careful review of the record reveal any basis for such an allegation. In the absence of any showing of actual prejudice to defendant, any error of the trial judge in failing to recuse was harmless.

## III. Constitutionality of the Death Penalty

■ Defendant raises several challenges to the constitutionality of Utah's capital sentencing scheme, § 76–3–207 (1978, 1988 Supp.). Briefly, his contentions are (1) the sentencing scheme does not narrow the class of offenders to which the death penalty applies, as required by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, *reh'g denied*, 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972); (2) the death penalty violates state and federal due process and equal protection provisions; (3) section 76–3–207 is overbroad and vague; and (4) the death penalty violates article I, section 9 of the Utah Constitution and the ban on cruel and unusual punishment contained in the eighth amendment of the United States Constitution.

These challenges to Utah's death penalty and sentencing scheme were thoughtfully and carefully considered in *State v. Wood*, 648 P.2d 71 (Utah (per curiam), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *Andrews v. Morris*, 607 P.2d 816, 823–24 (Utah), *cert. denied*,

449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980); *Pierre v. Morris*, 607 P.2d 812, 814–15 (Utah), *cert. denied*, 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980); *State v. Andrews*, 574 P.2d 709, 710 (Utah 1977), *reh'g denied*, 576 P.2d 857 (Utah), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *State v. Codianna*, 573 P.2d 343, 348 (Utah 1977), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *State v. Pierre*, 572 P.2d 1338, 1345–46, 1356 (Utah 1977), *reh'g denied*, 576 P.2d 857 (Utah 1978); *see Andrews v. Morris*, 677 P.2d 81, 83–84 (Utah 1983). Most of these claims have also been treated by the U.S. District Court for the District of Utah and the Tenth Circuit Court of Appeals. *Andrews v. Shulsen*, 600 F.Supp. 408 (D.Utah 1984), *aff'd*, 802 F.2d 1256 (10th Cir.1986), *cert. denied*, 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253, *reh'g denied*, 485 U.S. 1015, 108 S.Ct. 1491, 99 L.Ed.2d 718 (1988); *Selby v. Shulsen*, 600 F.Supp. 432 (D.Utah 1984), *aff'd sub nom. Pierre v. Shulsen*, 802 F.2d 1282 (10th Cir.1986), *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987), *reh'g denied*, 483 U.S. 1012, 107 S.Ct. 3246, 97 L.Ed.2d 750 (1987). Since the reasoning of the above-cited cases is sound and persuasive on the issues defendant now urges upon this Court, we find it unnecessary to repeat that analysis in this opinion. We hold that the death penalty as applied under our statutory scheme is in accordance with the requirements of the Constitution of the United States and the Constitution of the State of Utah. *State v. Bishop*, 753 P.2d 439, 460 (Utah 1988); *State v. Tillman*, 750 P.2d 546, 572 (Utah 1987).

## IV. Use of Prior Violent Felony as an Aggravating Circumstance

■ Defendant asserts that section 76–5–202(1)(h) denies his right to due process as guaranteed by the fifth and fourteenth amendments to the United States Constitution and by article I, section 7 of the Utah Constitution. That section provides:

(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:

. . . .

(h) The actor was previously convicted of first or second degree murder or of a felony involving the use or threat of violence to a person.

He contends that allowing the admission of two of his prior convictions in the guilt phase of the trial was unfairly prejudicial because the jury, upon learning of his other convictions, was prone to convict him because of his "bad character." We do not agree that evidence of his two prior convictions had any prejudicial effect.

The facts surrounding the incident out of which the instant case arises are intertwined around the basic fact that defendant was attempting to escape from lawful prison custody; thus, it was not possible to present to the jury any picture of the factual setting without revealing at least one of defendant's prior convictions. The aggravating circumstance required by section 76–5–202(1)(h) was proven by entering into evidence copies of defendant's commitments to the Utah State Prison on robbery charges. However, no attempt was made thereafter to try defendant on the basis of his "bad character." Throughout the remainder of the trial, the prosecution only referred to the prior convictions as they related to the elements of the crimes charged. Defendant took the stand and disclosed his extensive criminal record in his direct testimony. He revealed other convictions that were potentially more prejudicial, including aggravated assault and aggravated assault on a prison guard. He stipulated to the introduction of the evidence challenged here.

Because defendant's guilt was manifest by overwhelming direct evidence, we cannot say that the inclusion of his prior convictions as an element of the crime of first degree murder had any unfair prejudicial effect on the conduct or outcome of his trial. Since we find that application of section 76–5–202(1)(h) did not violate his right to due process in the instant case, we reserve ruling on the constitutionality of that section. We also briefly note that

application of that section is not essential to defendant's conviction of first degree murder since the jury also unanimously found two additional aggravating circumstances upon which the conviction of first degree murder rests, namely, creating a great risk of death to a person other than the victim and committing a homicide for the purpose of effecting defendant's escape from lawful custody. § 76–5–202(1)(c), (e).

■ We find no merit in defendant's contention that the same aggravating circumstance cannot be relied upon in the guilt phase and in the penalty phase. *Lowenfield v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546, 553, 98 L.Ed.2d 568, 579 *reh'g denied*, 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988).

## V. Challenge for Cause

■ Defendant contends that he was improperly denied a challenge for cause. We have held it to be prejudicial error where a peremptory challenge is used to remove a prospective juror who should have been excused for cause. *State v. Brooks*, 631 P.2d 878, 884 (Utah 1981).

Defendant asserts that Mr. Copinga, a prospective juror, should have been excused for cause because he expressed a personal preference for the death penalty. In *State v. Norton*, 675 P.2d 577, 589 (Utah 1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds*, *State v. Hansen*, 734 P.2d 421 (Utah 1986), we stated:

> Persons who cannot vote for the imposition of capital punishment in any circumstances and persons who feel compelled to vote for the imposition of capital punishment in all circumstances of murder are properly excluded for cause. The proper test of legal partiality is whether a juror's views about capital punishment would prevent or substantially impair him or her from conscientiously taking the juror's oath and performing his or her duties as a juror by following the court's instructions on the law of capital punishment and applying them to the facts of the particular case.

*Cf. Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980).

Mr. Copinga stated that he did not have any strong commitment one way or the other on the death penalty. He only stated his personal preference that he would rather die than spend the rest of his life in confinement. He said that he would apply the law strictly according to the evidence and that when it came to imposing the penalty, he was not leaning more toward either life in prison or death. He considered life in prison a very severe punishment. When properly informed of the bifurcated nature of the proceeding and that the aggravating circumstances must outweigh the mitigating circumstances, he was asked, "In the penalty phase, if you found that those requirements were not met, could you vote for life?" He answered, "If it was that clear-cut, I don't think there would be any problem."

The defense withdrew his challenge, and the judge made no ruling. Defendant nevertheless now contends that the judge should have excused Copinga on the court's own motion and that the failure to do so was an abuse of discretion constituting "manifest and prejudicial error." *State v. Tillman*, 750 P.2d at 553. A review of the entire *voir dire* reveals that Copinga's views on capital punishment would not impair his ability to decide the case according to the law as instructed. Therefore, under the standard enunciated in *Norton*, dismissing him for cause was not required.

## VI. Court Security

■ Defendant contends that excessive security was used in the courtroom, which adversely affected his right to a fair trial. We find no merit to this contention. Four unarmed plainclothes guards were present at trial: two sat behind defendant, and two were stationed elsewhere in the courtroom. At the noon recess on the second day of trial, defendant moved for a mistrial, claiming that excessive security in the courtroom gave the jury the impression that he was a dangerous man. The trial judge denied the motion but instructed defendant and the security guards to remain seated

until the jury had left the courtroom. Previously, one or two guards had stationed themselves between the jury and defendant when court recessed. Throughout the remainder of the trial, the guards remained seated until the jury left the courtroom.

This case is unlike cases cited by the defense where the defendant was tried in prison garb and shackles. *See People v. Duran*, 16 Cal.3d 282, 127 Cal.Rptr. 618, 625, 545 P.2d 1322, 1329 (1976). The security was even less intrusive than that in *Holbrook v. Flynn*, 475 U.S. 560, 572, 106 S.Ct. 1340, 1348, 89 L.Ed.2d 525, 537 (1986), where the Court held that it was not prejudicial for four armed, uniformed state troopers to occupy the seats immediately behind the defendant. The trial court, in allowing the extra security, was protecting a legitimate state interest in maintaining custody of the defendant since he was still under sentence from prior convictions and was being held without bail. *Id.* at 572, 106 S.Ct. at 1347, 89 L.Ed.2d at 536. The additional security measures in the instant case were prudent since defendant was on trial for events that occurred in an aborted escape during a court appearance, and they were accomplished through the least obtrusive methods available. When defendant complained of the action of the guards, measures were immediately taken to obviate any potential prejudicial effect. We find that no undue prejudice was occasioned by the security employed at trial.

## VII. Cross–Examination of Richard Thomas

Defendant contends that his sixth amendment right to confrontation was abridged when the trial court cut off his recross-examination of Richard Thomas. The right to cross-examine is an invaluable right embodied in article I, section 12 of the Utah Constitution and the sixth amendment of the United States Constitution. *State v. Maestas*, 564 P.2d 1386, 1387 (Utah 1977). However, "the extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted." *Smith v. Illi-*

*nois*, 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956, 959 (1968) (citing *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624, 629 (1931)). In reviewing defendant's claim, we look to see if the trial court abused its discretion in limiting cross-examination and, if so, if the result was prejudicial to him. *State v. Maestas*, 564 P.2d at 1388.

Some six months prior to trial, Thomas gave a recorded statement concerning the shooting. At trial, he testified on cross-examination that he did not recall certain questions that were asked him when he gave the statement or his answers. He was then given a transcript of the statement, after which he recalled stating that he had characterized defendant as being glassy-eyed at the time of the shooting. He again repeated the earlier statement on redirect. After he was asked again on recross about his previous statement, the trial court stated, "I am going to cut it off on both sides. It has been developed by both of you as to what was said."

Both counsel had the opportunity to question the witness about the previous statement; the contents of the statement were repeated several times; and the transcript was placed into evidence. Defendant was on recross-examination and had covered the points brought out by the prosecution on redirect. At the time the court cut off that line of questioning, defendant was repeating points asked and answered on cross-examination. While we agree that broad latitude should be afforded a defendant on cross-examination, the trial court did not abuse its discretion by cutting off the repetitive questioning at this point.

## VIII. Testimony of Officer Jorgensen

Defendant testified at trial that after he was shot, he was in a daze, his eyes were out of focus, objects before him were blurred, and his ears were ringing. Consequently, he claimed to be unable to recall much of what happened after he was shot. On rebuttal, the State, in an attempt to impeach defendant through his prior inconsistent statements, called as a witness Offi-

cer Jorgensen, a prison officer assigned to guard defendant while he was recuperating in the hospital. Jorgensen related statements and admissions made by defendant to him in a conversation which they allegedly had in the hospital which indicated that defendant was fully aware of what he was doing as he attempted to find his way out of the Hall and escape. Defendant denied that the conversation ever took place and contends that the testimony of Officer Jorgensen contained statements allegedly made by defendant in a custodial interrogation without the benefit of *Miranda, Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (requiring that defendants be informed of their right to counsel and right to remain silent prior to custodial interrogation), and without the benefit of counsel in violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

While we will address issues when reviewing a death penalty which were briefed on appeal but were not properly objected to below, *State v. Tillman,* 750 P.2d at 552, we need not reach the merits of defendant's alleged *Miranda* violation. Even assuming the statements were taken in violation of *Miranda* and *Massiah,* they were offered on rebuttal only for purposes of impeachment and as such are admissible. *United States v. McManaman,* 606 F.2d 919, 924–25 (10th Cir.1979); *State v. Walker,* 138 Ariz. 491, 675 P.2d 1310, 1314 (1984); *Lemasters v. People,* 678 P.2d 538, 542–43 (Colo.1984); *State v. Cartwright,* 200 Mont. 91, 650 P.2d 758, 763 (1982); *State v. Holland,* 98 Wash.2d 507, 520, 656 P.2d 1056, 1063 (1983); *State v. Mills,* 76 Or.App. 301, 710 P.2d 148, 149–50 (1985).

Defendant asserts that the failure to instruct the jurors as to the limited use they could make of the statements was "manifest error," requiring reversal of his conviction. We disagree. No objection was made to the introduction of Jorgensen's testimony. The issue of whether the statements were taken in violation of *Miranda* and were admissible only for impeachment was not raised at trial; even so, the evidence was offered on rebuttal only

for that limited purpose. Thus, when the evidence was received, the jury was faced only with deciding whether Jorgensen or defendant was telling the truth. After the testimony was offered and received for this purpose and counsel had the opportunity to assess its potential impact on the jury, no limiting instruction was requested. No exception was taken to note the absence of any limiting instruction. Given the nature of the testimony, the State's objective in offering it, and the manner in which it was received into evidence, we cannot say that there was manifest error in the failure of the trial court to give a limiting instruction sua sponte.

### IX. Manslaughter Instruction

Defendant contends that the court erred in instructing the jury regarding the lesser offense of manslaughter. His theory of the case on which he relied to support the giving of the manslaughter instruction was that from the time his accomplice handed him a loaded gun, or at least from the time he was shot in the shoulder, he was acting under an "extreme emotional disturbance."

Section 76–5–205 provides:

(1) Criminal homicide constitutes manslaughter if the actor:

. . . .

(b) causes the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse.

Although our statute differs in some respects from the model penal code version on which it was based, the official comments to the model code are applicable in determining when an emotional disturbance is excusable. On the subject, the drafters of the model code offered the following insight:

[A]n emotional disturbance is excusable "if it is occasioned by any provocation, event or situation *for which the offender was not culpably responsible.*" Under this formulation, extreme emotional disturbance will not reduce murder to manslaughter if *the actor has intentionally, knowingly, recklessly, or negligently*

*brought about his own mental disturbance, such as by involving himself in a crime.*

Model Penal Code § 210.3 (official draft & revised comments, 1980, Part II, at 64 (emphasis added; citation omitted) (quoting the National Commission on Reform of Federal Criminal Law, Brown Commission Final Report 1602(b))).

This comment coincides with instruction No. 34 given by the trial court, which read:

### INSTRUCTION NO. 34

For Manslaughter to apply, the "extreme mental or emotional disturbance" must be triggered by something external from the accused, and his reaction to such external stimulus must be reasonable, and the terms must be given the meaning you would give them in common everyday use. *Such disturbance therefore cannot have been brought about by the defendant's* own peculiar mental processes or by his *intentional knowing or reckless acts.*

"Extreme" means excessive, or far advanced, or grievous.

"Mental" means relating to or existing in the mind.

"Disturbance" refers to a state of being disturbed, agitated, disordered, or distressed.

"Emotional" pertains to emotions and has to do with feelings or passions.

In determining whether or not the defendant acted under the influence of extreme mental or emotional disturbance, you should consider all of the circumstances surrounding the death of the victim. If you find that the defendant, Ronnie Lee Gardner, caused the death of Michael Joseph Burdell, while under the influence of extreme mental or emotional disturbance, you must next determine whether or not there was a reasonable explanation or excuse for such disturbance. The reasonableness of the explanation or excuse for the extreme mental or emotional disturbance is to be determined from the viewpoint of a reasonable person under the then existing circumstances.

(Emphasis added.)

Although a majority of this Court rejected portions of a similar instruction given in *State v. Bishop,* 753 P.2d at 472, any error here was harmless. The triggering event according to defendant's theory of the case was his escape attempt in which he was wounded. Thus, defendant's "emotional disturbance" was a product of "his knowingly or intentionally involving himself in the commission of a crime" and could not be "excusable." Therefore, any error in the instruction [2] given was harmless.

### X. Oral Instruction

Defendant contends that the trial court erred in giving an oral instruction sua sponte. He argues that the instruction had the effect of precluding the jurors from considering any of the lesser included offenses until they were unanimous in acquitting him of first degree murder.

The trial judge, in giving instruction 27 on first degree murder, added the following oral clarification to the written instruction:

With reference to count I, you determine his guilt or innocence of capital homicide, murder in the first degree. If that is your verdict, then you don't have to further consider the included offenses within count I.

As you can see, if you start from the bottom and work up, them [sic] being included offenses, you will find any more or all of those to exist, so you start at the top under count I, and work down as I have instructed you in the last sentence.

If you find him not guilty of murder in the first degree, you shall then consider the guilt or innocence of the defendant of

2. We also note, as we stated in *State v. Gallegos,* 16 Utah 2d 102, 104–05, 396 P.2d 414, 415–16 (1964), and *State v. Valdez,* 30 Utah 2d 54, 58, 513 P.2d 422, 424 (1973), that generally an error in a manslaughter instruction where the jury finds an intentional killing is not prejudicial. *State v. Bishop,* 753 P.2d at 472 (Durham, J., concurring).

the lesser included offense of capital homicide, murder in the second degree.

In *State v. Clayton*, 658 P.2d 624, 627 (Utah 1983), we held that it was not error for the trial court to direct the jury to begin by determining whether the defendant was guilty of the charged offense. However, we believe that it would be well to do this by means of suggestion rather than an absolute direction. So held the Supreme Court of Michigan in *People v. Mays*, 407 Mich. 619, 623, 288 N.W.2d 207, 208 (1980) (per curiam). There, the court stated:

> It is not error to suggest an order of consideration of offenses. The judge may suggest to the jury that it consider the charged offense first and it would be helpful to suggest that consideration be given to offenses with a "greater" number of elements before considering those with a "lesser" number.

In that case, the court set out the following suggested instruction which may be given, making it clear that such an instruction is not mandatory:

> You may give consideration to all the possible verdicts, but you should begin your deliberations by considering (the charged offense). Unless all of you agree to find the defendant guilty of (the charged offense), you may consider the other offenses upon which I have instructed you in the order in which the instructions were given. You may consider any of those offenses without having reached agreement concerning the defendant's guilt or innocence on any other of them. The purpose of this instruction is to aid and not to control your deliberation.

*People v. Mays*, 288 N.W.2d at 208, n. 1.

Although the oral instruction given in the instant case is not a model of clarity, we do not find that it demands or even implies the need for a unanimous vote of acquittal before the jury may consider lesser included offenses. However, in order to avoid any possible misunderstanding by the jurors, it would be well in the future to avoid instructing them that they must find the defendant not guilty of the charged offense before they may consider lesser included offenses. Instead, they may be instructed that they should consider the lesser included offenses if they do not find the defendant guilty of the charged offense. While the difference in wording is subtle, it avoids any possible misunderstanding that the jury must, by a unanimous vote, acquit the defendant on the charged offense before it may consider the lesser included offenses. The oral instruction given in the instant case, when read in connection with other written instructions given the jury, could not have reasonably created any confusion. Instruction No. 48 required a unanimous vote to convict. Instruction No. 15 stated: "If you find that the defendant in this case has committed a criminal homicide but you have a reasonable doubt as to which of two or more degrees of that crime he is guilty, you must convict him of the lowest degree only." These instructions, when read as a whole as we must, gave defendant the full benefit of the reasonable doubt standard and allowed the jury to give proper consideration to the lesser included offenses.

## XI. Directed Verdict/Sufficiency of the Evidence

■ At the close of the prosecution's case in chief, defendant moved the court to direct a verdict of either depraved indifference second degree murder or manslaughter. His motion was denied.

At the close of the prosecution's evidence, the court may dismiss a charge if the evidence presented is not legally sufficient to establish the elements of the offense. Utah R.Crim.P. 17(*o*). Here, the prosecution presented evidence that defendant shot and killed Michael Burdell under circumstances from which the jury could infer that his act was either knowing or intentional. Evidence was also presented on the aggravating factors which elevate the crime to first degree murder. Having established a prima facie case by presenting evidence on each element of the offense, the prosecution was entitled to have the charge submitted to the jury. There

was no error in denying defendant's motion for a directed verdict.

In reviewing a jury verdict to determine if it was based on sufficient evidence, we view the evidence presented and all inferences that can be drawn therefrom in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *State v. McClain*, 706 P.2d 603, 605 (Utah 1985). Where there is any evidence, including reasonable inferences that can be drawn from it, from which findings of all the elements of the crime can be made beyond a reasonable doubt, our inquiry is complete and we will sustain the verdict. *McClain*, 706 P.2d at 605; *see also Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792–93, 61 L.Ed.2d at 578.

Viewed in the light most favorable to the verdict, the observations of the witnesses to the shooting, as well as defendant's actions prior to, during, and following the shooting, comprised sufficient, competent evidence that defendant acted knowingly or intentionally in causing the death of Michael Burdell. We find therefore that there was sufficient evidence to sustain the verdict.

XII. Presentation of Aggravating/Mitigating Factors in the Penalty Phase

■ Defendant contends that the trial court erred in admitting, in aggravation of the penalty, evidence of a previous homicide he had committed. Section 76–3–207(2) provides in relevant part:

(2) In these sentencing proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admis-

sibility under the exclusionary rules of evidence. . . . Aggravating circumstances shall include those as outlined in 76–5–202.

Defendant argues that since the language of the first degree murder statute, section 76–5–202(1)(h), refers to "previous convictions"[3] of first or second degree murder, the State was precluded from putting on evidence of the prior homicide in the penalty phase of his trial since he did not plead guilty to the prior crime until after the commission of the offense in the instant case but prior to trial. In support, defendant cites *People v. Balderas*, 41 Cal.3d 144, 222 Cal.Rptr. 184, 216–18, 711 P.2d 480, 513–14 (1985), for the proposition that convictions prior to the commission of the offense indicate that the defendant was undeterred by the prior conviction, but that convictions postdating the incident were not relevant for that purpose.

Defendant's reasoning is not sound. *Balderas* deals with admission of convictions of prior *nonviolent* felonies. Even under the California sentencing scheme, there is no such limitation placed on the use of violent crimes. *Id.*, 222 Cal.Rptr. at 217, 711 P.2d at 514. The violent nature of the crimes makes them relevant to the defendant's character, which is a key focus of the sentencing proceeding.

Aggravating circumstances under section 76–3–207 include, but are not limited to, those listed in section 76–5–202. Evidence of other aggravating factors is not prohibited "as long as that information is relevant to the character of the defendant or the circumstances of the crime." *Barclay v. Florida*, 463 U.S. 939, 967, 103 S.Ct. 3418, 3433, 77 L.Ed.2d 1134, 1154 (1983) (citing *Zant v. Stephens*, 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 250–51 (1983)). The prior homicide was relevant to defendant's character, background, and history and was admissible under the plain language of section 76–3–207, even though it had not yet resulted in

---

**3.** In *State v. Lafferty*, 749 P.2d 1239, 1260 (Utah 1988), we held that evidence of other violent crimes which have not resulted in convictions is admissible as aggravation of the penalty, subject

to a finding by the fact finder beyond a reasonable doubt as to the defendant's guilt of those other crimes.

a conviction at the time of the shooting in the instant case.

Defendant also contends that the trial court erred in not admitting certain evidence in mitigation of the penalty. He offered affidavits of attorneys who had appeared as counsel in other capital homicide cases. The affidavits briefly summarized the facts and sentences given in those cases. They were offered to provide the jury with a basis on which to determine the "nature" of defendant's crime. Defendant a.so offered testimony of associates of the victim regarding their opposition to the death penalty.

■■■ The nature of defendant's crime was fully explored and presented to the jury, as were the attendant circumstances. Comparison with other homicide cases presented in capsulized form would shed no further light on defendant's crime, but would instead encourage the jury to consider information extraneous to defendant's character and the circumstances of his offense. In *Williams v. State*, 445 So.2d 798, 815 (Miss.1984), *cert. denied*, 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985), the Mississippi Supreme Court upheld the exclusion of psychological testimony comparing the defendant with the typical killer. It held that while the defendant was entitled to testimony regarding his character, the trial court was not required to allow evidence concerning the characters of other capital murder defendants. Likewise, in the instant case, the court was not required to admit the affidavits capsulizing the facts and sentences given in other homicide cases. As stated by the United States Supreme Court in *Lockett v. Ohio*, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973, 990 n. 12 (1978), "Nothing in this opinion limits the traditional authority of the court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Our statutory scheme gives the trial judge discretion to admit "any matter the court deems relevant to sentence." § 76–3–207(2). The court's decision to exclude the affidavits is not contrary to our statutory requirements or the guidelines set down by the United States Supreme Court, nor was it an abuse of discretion.

■■■ The testimony offered regarding the opposition of the victim's associates to the death penalty was likewise properly excluded as irrelevant to the character of the accused or the nature of the crime. In *State v. Norton*, 675 P.2d 577, 588 (Utah 1983), we stated that allowing the defendant to present any evidence in mitigation of his crime was "not intended to turn a sentencing proceeding into a forum to consider the appropriateness of capital punishment in general." The United States Supreme Court, in *Booth v. Maryland*, 482 U.S. 496, 503–504, 107 S.Ct. 2529, 2533, 96 L.Ed.2d 440, 448 (1987), held that victim impact statements were not relevant to the sentencing proceeding and tended to shift the focus away from the character of the defendant and the circumstances of the crime. The reasoning of that case suggests that the opinions which the victim, his family, and his associates had regarding capital punishment could properly be excluded as irrelevant to the imposition of sentence. We find no abuse of discretion in the trial court's refusal to admit the proffered testimony.

XIII. Proportionality Review

■■■ Defendant contends that the sentence given in his case is not proportionate when compared to the sentences given in all other capital cases in this state. In *State v. Tillman*, 750 P.2d at 562, we held that comparative proportionality review was not required by either the federal or the state constitution.

In seeking comparative proportionality review, defendant misreads our case law and statutes. In *State v. Wood*, 648 P.2d 71, 77 (Utah) (per curiam), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), we stated that automatic review of a death sentence is conducted in order to "determine whether the sentence of death resulted from error, prejudice or arbitrariness, or was disproportionate." Section 76–1–104 provides in relevant part:

(2) The provisions of this [criminal] code shall be construed in accordance with these general purposes....

(3) Prescribe penalties which are proportionate to the seriousness of the offense and which permit recognition or differences in rehabilitation possibilities among individual offenders.

Neither this section nor the above-quoted language from *Wood* calls for the type of comparative review defendant would have this Court undertake. Determining whether the penalty is proportionate to the crime requires a careful and thoughtful consideration of the individual defendant and the circumstances surrounding his crime. Focus on the individual defendant and his acts is called for in section 76–1–104, not comparison with other criminals and their crimes. Each defendant is an individual, and each case is unique in its facts. Any attempt to draw broad comparisons between defendants or crimes calls for speculation as to why a particular defendant or crime was dealt with by that jury in that particular fashion. The many factors which may influence a jury's decision cannot be easily identified, let alone quantified.

We are therefore convinced that allowing the jury to conduct comparative proportionality review would confuse the issues and shift the focus away from the particular defendant and those aggravating and mitigating factors in his case and onto the application of the death penalty in the abstract. We are unpersuaded by the evidence presented of the necessity for this Court to undertake comparative proportionality review in all death penalty cases, nor do we feel compelled to accept defendant's invitation to conduct such a review voluntarily in the instant case.

### XIV. Prosecutorial Misconduct

Defendant cites four instances of behavior he characterizes as prosecutorial misconduct: (1) referring to defendant as "defendant Bishop"; (2) laughing during a presentation by defense counsel in the penalty

phase; (3) stating in the penalty phase that Gardner had escaped from maximum security; and (4) reading from a report that was not received into evidence. The test by which we measure alleged misconduct was articulated in *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987). We look to see if the actions or remarks of counsel call to the attention of the jury a matter it would not be justified in considering in determining its verdict and, if so, under the circumstances of the particular case, whether "the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant."

■ In the first instance alleged, the prosecution called defendant by the wrong name. Even though the name was that of another defendant of some notoriety,[4] it was not prejudicial. The reference, taken in context, was inadvertent, was immediately corrected, and did not interrupt the flow of the proceedings or focus the jury's attention on an improper basis for the verdict.

■ Defendant's second allegation is that the prosecuting attorney laughed during presentation of a portion of defense counsel's argument in the penalty phase. While we cannot condone such actions, we accept the State's · explanation that the prosecutor was merely reacting to defendant's counsel, who had removed exhibits the State had placed before the jury. The trial judge promptly admonished the prosecutor and determined that his action was neither significant nor prejudicial. Where there is no abuse of discretion, such a decision by the trial judge will not be reversed on appeal. *See State v. Valdez*, 30 Utah 2d at 60, 513 P.2d at 426. Our review of the record reveals nothing that would indicate that the trial court abused its discretion in denying a mistrial on this point.

■ Neither of the last claimed instances was improper. The reference to Gardner's escape from maximum security

---

**4.** Preceding this trial, Arthur Gary Bishop was tried for the murders of several young boys. His trial and conviction received prominent coverage in the local media. *See State v. Bishop*, 753 P.2d 439 (Utah 1988).

was a matter of interpretation. He was being held in "maximum security" at the time of his escapes, both in 1984 and in 1985, even though he was outside the confines of the maximum security unit of the prison when the escapes occurred. This fact was made clear to the jury; therefore, the remark did not misrepresent the facts or focus the jury's attention on an improper basis for its decision. Likewise, the portion of the medical report referred to by the prosecution had been read into the record; therefore, even though the written report had not been received in evidence, the prosecution was arguing from evidence in the record. We find no basis on which to reverse the judgment or sentence based on prosecutorial misconduct. Defendant makes other claims, but because there is no record of the facts from which they arise, we cannot reach them.

### XV. Ineffective Assistance of Counsel

Defendant, in supplemental briefing, raises the issue of ineffective assistance of counsel. Specifically, he points out counsel's failure to object to the testimony of Officer Jorgensen, Dr. Heinbecker, and Mr. Fuchs.

In *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), the United States Supreme Court set forth a two-part test to be used in examining claims based upon ineffective assistance of counsel. The defendant must show, first, specific acts or omissions which fall outside the wide range of professionally competent assistance and, second, that a reasonable probability exists that but for counsel's error, the result would have been different. *State v. Pursifell*, 746 P.2d 270, 275 (Utah Ct.App.1987); *State v. Frame*, 723 P.2d 401, 405 (Utah 1986) (citing *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699). In *State v. Speer*, 750 P.2d 186, 192 (Utah 1988), we adopted the approach suggested in *Strickland* that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." *See also Pursifell*, 746 P.2d at 275.

Here, we need not determine whether counsel's claimed shortfalls meet the first prong of the test. The failure to object to the testimony of Officer Jorgensen, as discussed in section VIII, *supra*, did not prejudice defendant. Even if his counsel had raised the objection and had been successful in showing a violation of *Miranda*, the evidence was still admissible for the purpose for which it was offered; therefore, no prejudice resulted from the lack of an objection to this point. Dr. Heinbecker, a forensic psychiatrist, testified on defendant's behalf as to possible sources of defendant's behavior, such as genetics, environment, and possible brain damage. Mr. Fuchs was a member of the Board of Pardons and was called by the defense to testify generally as to the Board's role in reviewing sentences and determining parole dates. Defendant does not identify any instance where his counsel failed to object to any questions asked during cross-examination of either witness. Our review of the record does not show conduct of counsel during the testimony of either witness which was lacking in any aspect of effective assistance. Having carefully reviewed the transcript and proceedings below and the briefs on appeal, we are convinced that there was no prejudice to defendant in these regards. Defendant makes other allegations of ineffective assistance of counsel. However, no record was made on which we can review them.

### XVI. Cumulative Error

Having fully reviewed the extensive record in this case, we are convinced that defendant's constitutional rights were cautiously guarded at all phases of the proceeding and that, overall, the trial was conducted in the fair and dignified fashion a capital case deserves. We reject defendant's assertions that the cumulative effect of the alleged irregularities discussed above denied him a fair trial.

Defendant's convictions and sentences, including the sentence of death for the first degree murder conviction, are affirmed.

HALL, C.J., concurs.

STEWART, Justice (concurring):

I concur in the majority opinion. However, because today's opinion might otherwise be taken as casting doubt on the position of a majority of the Court on one important point, I append these comments. The majority holds that it is not necessary to reach the issue of the admissibility of prior crime evidence used to prove a capital homicide aggravating factor under Utah Code Ann. § 76–5–202(1)(h) because the admission of that evidence was at most harmless error. That ruling is a sufficient disposition of the issue here.

Nevertheless, it is especially important in a capital case to make the law as clear as possible so as to avoid unnecessary error in the future. For that reason, I think it appropriate to state my concurrence with Justice Zimmerman's opinion in this case which holds that evidence of other crimes used to prove an aggravating circumstance under § 76–5–202(1)(h) must be proved after a jury has first found a defendant guilty of the underlying intentional homicide.

In *State v. Bishop*, 753 P.2d 439, 489 (Utah 1988), I joined Justice Zimmerman's concurring opinion that expressed a similar view in a somewhat different legal context. Nevertheless, I expressly refrained from joining that opinion insofar as it was based on constitutional grounds. Again, I decline to adopt a constitutional basis for the rule.

The courts historically have had inherent supervisory power over the order of adducing evidence in a case. Reliance on that power in this case is preferable since it is ordinarily better to avoid a constitutional ruling when there is another basis for decision. Constitutionalization of the rule requiring bifurcation could lead to a degree of rigidity in evidentiary matters that could have untoward consequences. Evidence of prior crimes may be appropriate or necessary in the guilt phase of the trial for a variety of reasons. Such evidence may be admissible pursuant to Rule 404(b) to prove motive, intent, identity, and other material issues under certain circumstances. *See, e.g., State v. Forsyth*, 641 P.2d 1172 (Utah 1982). There may even be instances when a defendant chooses to adduce prior crime evidence, for example, to establish an alibi by showing that he was incarcerated at the time of an alleged crime. In addition, the Legislature has in a number of instances made prior crimes elements of other substantive crimes. Constitutionalization of the rule might affect the use of prior crimes in unanticipated ways. The net effect of all this is that exclusion of evidence of prior crimes as aggravating circumstances on due process grounds could have far-reaching ramifications that I am not prepared to confront.

ZIMMERMAN, Justice (concurring):

 I join in the majority opinion. However, I write separately to point out that the trial court erred in admitting evidence of Gardner's prior convictions before the jury had determined whether Gardner was guilty of a knowing or international homicide.[1] *See State v. James*, 767 P.2d 549, 556–557 (1989); *State v. Bishop*, 753 P.2d 439, 494–99 (Utah 1988) (Zimmerman, J., concurring, joined by Stewart and Durham, J.J.). The bifurcated guilt phase procedure that a majority of the Court said was required in *Bishop* and that we unanimously imposed in *James* should have been followed in the present case. *See James*, 767 P.2d at 556–557; *cf. State v. Payton*, 361

---

1. If there is any doubt that evidence of prior convictions and other bad acts has tremendous potential to sway the finder of fact unfairly, those doubts should be dispelled by several recent empirical studies. *See, e.g.,* Greene & Loftus, *When Crimes are Joined at Trial,* 9 Law & Hum. Behav. 193, 193–94, 196–98, 201, 204–06 (1985); Teitelbaum, Sutton–Barbere & Johnson, *Evaluating the Prejudicial Effect of Evidence: Can Judges Identify the Impact of Improper Evidence on Juries?,* 1983 Wis.L.Rev. 1147, 1173–74 & Table E nos. 3 & 4; Wissler & Saks, *On the Inefficacy of Limiting Instructions,* 9 Law & Hum. Behav. 37, 37–39, 41–47 (1985); Note, *The Appearance of Justice: Judges' Verbal and Nonverbal Behavior in Criminal Jury Trials,* 38 Stan. L.Rev. 89, 105, 113, 120–24 & n. 99 & Table 1, 129–30, 133 (1985). The studies uniformly show that in cases involving the same or similar facts, the admission of evidence of prior convictions or the joinder of separate charges significantly increases the likelihood that the accused will be convicted.

So.2d 866, 870–74 (La.1978) (holding that prior convictions may not be introduced in the guilt phase of a murder trial and that they may therefore not serve as elements of the crime of first degree murder but must be limited to introduction in the penalty phase as aggravating circumstances justifying imposition of the death penalty).

A situation virtually identical to that in both the present case and *James* was presented in *Bishop*. During the guilt phase of Bishop's trial for sexual abuse and murder, the State offered evidence of many unrelated prior sexual crimes. The Chief Justice, joined by Associate Chief Justice Howe, concluded that the admission of this evidence during the guilt phase did not deny Bishop his constitutional rights because it was authorized by section 76–5–404.1(3)(g) of the Code, which makes one convicted of sexual abuse of a child eligible for an enhanced penalty if the convicted person has committed more than five other acts of sexual abuse. *See Bishop*, 753 P.2d at 483–88; Utah Code Ann. § 76–5–404.1(3)(g) (Supp.1988). However, in a separate opinion a majority of the Court, consisting of Justice Stewart, Justice Durham, and me, held that the introduction of the prior crimes evidence during the guilt phase was not permitted by section 76–5–404.1(3)(g). *See Bishop*, 753 P.2d at 494–97 (Zimmerman, J., concurring). Alternatively, we held that even if section 76–5–404.1(3)(g) did authorize introduction of this evidence during the guilt phase, we would exercise our inherent supervisory power over the trial courts to require the trier of fact to determine guilt on the underlying charge before evidence of unrelated prior conduct could be admitted to enhance the penalty. *See Bishop*, 753 P.2d

at 498–99 (Zimmerman, J., concurring). This procedure preserves both the accused's interest in a fair trial and the State's interest in punishing repeat offenders more severely. We found no legitimate state interest to be served by requiring the introduction of the unrelated prior crimes evidence during the guilt phase.[2]

In *James*, issued several weeks ago, we unanimously held that evidence of prior convictions may not be introduced in the guilt phase of a first degree murder trial until after the finder of fact has determined whether the defendant is guilty of a knowing or intentional killing. 767 P.2d at 556–557. That holding followed the separate majority in *Bishop*, but extended it to section 76–5–202(1)(h).[3] *See James*, 767 P.2d at 556–557.

The next question is whether the trial court's erroneous mode of proceeding resulted in prejudicial error. As Associate Chief Justice Howe notes, the only evidence of prior crimes introduced to satisfy the requirements of section 76–5–202(1)(h) of the Code related to two robberies. *See* Utah Code Ann. § 76–5–202(1)(h) (Supp. 1988). After the evidence of the previous crimes was admitted, the prosecutor referred to the prior convictions only as necessary to demonstrate that the State had proven the aggravating element of first degree murder contained in subpart (h). Gardner took the stand and disclosed his extensive criminal record, which included other convictions that were more prejudicial than the two robberies. Finally, Gardner did not contest that he had, in fact, committed the murder of which he was convicted; his only defense was that

2. In *Bishop*, Justice Durham and I would have gone further and held that the Chief Justice's reading of section 76–5–404.1(3)(g) violates the due process clause of article I, section 7 of the Utah Constitution. 753 P.2d at 497–98. Justice Stewart found no occasion to reach that question. In the present case, there is no need to revisit the constitutional question since the Court has already unanimously expressed itself as being of the view that admission of the evidence of prior crimes was improper on nonconstitutional grounds. *See State v. James*, 767 P.2d 549, 556–559 (1989); *In re Clatterbuck*, 700 P.2d 1076, 1080–81 (Utah 1985).

3. Section 76–5–202(1)(h), the provision challenged both in the present case and in *James*, is indistinguishable from section 76–5–404.1(3)(g), the section at issue in *Bishop*. In fact, the separate majority opinion in *Bishop* cites section 76–5–202(1)(h) as a statute which produces the same evil that led to the conclusion that the order of proof followed by the trial judge in *Bishop* was improper. *See Bishop*, 753 P.2d at 499 n. 8 (Zimmerman, J., concurring).

he did not have the requisite intent for first degree murder.

Under these circumstances, I conclude that the error committed by the trial court was harmless under the standard contained in rule 30 of the Utah Rules of Criminal Procedure and rule 103 of the Utah Rules of Evidence. *See State v. Bishop*, 753 P.2d at 499–500 (Zimmerman, J., concurring); *State v. Hackford*, 737 P.2d 200, 204–05 & n. 1 (Utah 1987); Utah R.Crim.P. 30; Utah R.Evid. 103. I also conclude that the error was harmless under the federal constitutional harmless error standard, if it is applicable here. *See Bishop*, 753 P.2d at 500–01 (Zimmerman, J., concurring); *Hackford*, 737 P.2d at 205–06 & n. 3.

For the foregoing reasons, I join the majority in holding that Gardner's conviction should be affirmed.

DURHAM, J., concurs in the concurring opinion of ZIMMERMAN, J.